THE NATIONAL BANK OF LEBANON *v.* THE LOUISVILLE INSUR-
ANCE & BANK CO.

**Notice—Rights of Pledgee of Stock.**

Failure of a pledgee of stock to make investigation of the relation existing between the pledgor and the company which issued the stock, does not subordinate the rights of the pledgee to that of the company which issued the stock, where it is manifest that diligence, however great, could not have enabled the pledgee to discover the fraud complained of by the company.

**Notice—Constructive Notice.**

Constructive notice is the evidence of notice which the court will not allow to be controverted. and whatever puts a party upon inquiry amounts to constructive notice to him of all the facts that would have developed if he had pursued the inquiry with reasonable and proper diligence.

**Banks and Banking—Effect of Pledge of Unpaid Bank Stock.**

Where a bank was negligent in permitting its books to be so kept as to conceal from the world the true state of its cashier's relations to it, a court of equity will not so apply the rules of equity as to protect the bank in its rights as to unpaid stock pledged by its cashier to plaintiff, where examination by plaintiff as to the status of the relations between the cashier and the bank would not have revealed such relation.

APPEAL FROM MARION CIRCUIT COURT.

January 30, 1874.

OPINION BY JUDGE LINDSAY:

The first loan by the Louisville Insurance & Banking Company to Mitchell was made March 30, 1870, and the second on the 16th of April, 1870. Contemporaneously with each of these loans, Mitchell pledged to the company a certificate for twenty-five shares of the capital stock of the National Bank of Lebanon.

Mitchell failing to pay, and the National Bank refusing to allow the stock to be transferred upon its books, so that the insurance and banking company could sell it as provided for by the terms of the pledge, this suit was instituted to settle and determine the relative rights of the insurance company and the bank, the latter claiming, first, that Mitchell had not paid for the stock, and that, there-

fore, under the provisions of the fifteenth section of the Currency Act, approved June 3, 1864, it had the right to sell it, and appropriate the proceeds to the payment of Mitchell's subscription, and, second, that Mitchell, by reason of defalcations and embezzlements committed whilst acting as cashier was at the time the certificates of stock were assigned to the insurance company, greatly indebted to the bank, and that by virtue of one of its by-laws, it had a lien on the stock to secure the payment thereof.

At the time the insurance company accepted the transfer of the certificates of stock as collateral security for the amounts loaned to Mitchell, this state of facts appeared upon the books of the banking association: First, that Mitchell owned more than fifty shares of its capital stock; second, that it was paid for; third, that the two certificates were issued on the 25th of August, 1869, more than six months before either of them were pledged; fourth, that the dividend declared in January, 1870, was passed to the credit of Mitchell, just as was done in the case of each and all persons owning paid up stock.

It is true the books of the bank were kept by Mitchell, but it is also true that the most casual examination of them would have disclosed all these facts to the directory; and, in fact, it is not pretended that they were not fully apprised of everything that appeared on the books relative to the stock subscribed for by Mitchell.

It further appears in proof that the bank did accept the transfer of the assets of Burton, Mitchell & Co., as payment in full for the stock subscribed for by each of the members of that firm, and hence that in March and April, 1870, the books not only showed that Mitchell had paid for his stock, but that the directors of the bank believed that he had so paid; and in all matters connected with it they acted upon that assumption. It is immaterial, therefore, that Mitchell filled up the two certificates to himself without calling the special attention of the president to the fact. He entered it upon the books, and the president could not at that time, laboring as he did under the belief that it was paid for, have disapproved his action in the premises, nor have taken any steps for the protection of the bank.

Now, if the insurance company had examined the books of the bank, or inquired of the president and directors as to the right of Mitchell to dispose of his stock, the information it would have

acquired would have been not only that it was paid for, but that Mitchell owed the bank nothing, and hence that his title was clear and unencumbered. This information it doubtless received from Mitchell, and as it would have learned nothing else upon inquiry of the party now claiming a superior lien upon the stock, it cannot occupy a more favorable attitude than if it had made an investigation that would have confirmed the truth of all of Mitchell's representations. The bank attempts to show that the stock had not been paid for, by proving that Mitchell defrauded it in transferring to it the assets of Burton, Mitchell, etc., that he induced it to accept said assets at $51,000 when in point of fact they amounted to about $39,00; and that when it is relieved against this fraud it will be plain that the stock was not paid for, although it so appeared upon the books. Now the insurance company, by the transfer of the certificates of stock, acquired certainly an equitable right to subject it to the payment of the amounts loaned to Mitchell. The right of the bank to sell the stock to pay the unpaid purchase price is in the nature of a statutory lien. The legal title is still in Mitchell, no transfer having been made on the books of the bank. The question then is, which has the superior equity, the bank or the insurance company? If the insurance company had actually examined the books and made inquiry of the directors of the bank, and then accepted the pledge of the stock upon the faith of the information thus acquired, the bank would have been estopped to deny the superiority of the insurance company's claim. There seems to be no good reason why its rights shall be subordinated to that of the bank, because it did not make the investigation, it being manifest that no diligence, however great, could have enabled it to discover the evidences of the fraud upon which the bank now relies for relief, and which it had permitted Mitchell so effectually to conceal.

The same reasons apply to Mitchell's indebtedness to the bank. The books did not show the indebtedness, and the directory did not discover its existence until June, 1870, more than two months after the stock had been pledged to the insurance company.

The bank asks that the insurance company shall be treated as having constructive notice of its rights. Constructive notice is the evidence of notice, which the court will not allow to be controverted. Whatever puts a party upon inquiry amounts to constructive notice to him of all facts that would have been developed had

he pursued the inquiry with reasonable and proper diligence. He cannot excuse want of inquiry upon the ground that had he made it, he would have been misled by a false answer, or one leading to no result, for ordinarily it cannot be known whether or not this would have been the case. Here, however, it is shown by the bank's own witnesses that inquiry would have confirmed the insurance company in the belief that Mitchell's right to sell or pledge his stock was perfect, and would therefore, have encouraged it to accept the pledge; moreover, the bank which asks that the doctrine of constructive notice shall be applied in its favor, was itself guilty of culpable negligence in permitting its books to be so kept as to conceal from the world the true state of Mitchell's relations to it. We have met with no case in which a party has been held to have had constructive notice of the existence of facts of which he could not have informed himself by the most diligent inquiry. In this case the bank is itself to a very great extent, responsible for the difficulties attending the discovery of the rights it here asks to have protected, hence we feel no inclination to extend in its favor an equitable rule intended to protect the innocent, and not to encourage negligence and inattention.

For these reasons we conclude that the judgment appealed from accords with the equities of the case, and we therefore affirm it.

*Muir Byers, Davie, Harrison, for appellant.*

*Noble, for appellee.*